**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAN LA BOTZ, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   11-1247 (RC) |
| | : | |
| v. | : | Re Document No.:   10 |
| | : | |
| FEDERAL ELECTION COMMISSION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**DENYING THE FEC'S MOTION TO DISMISS**

**I.  INTRODUCTION**

Dan La Botz is a member of Ohio's Socialist Party who ran an unsuccessful candidacy for the U.S. Senate in 2010. La Botz claims that he was unfairly excluded from three televised debates that took place in October 2010, the month preceding the election. He filed an administrative complaint with the Federal Election Commission ("FEC"), alleging that his exclusion from the debates violated the Federal Election Campaign Act ("FECA"). The FEC dismissed his complaint, and La Botz brought suit, claiming that the FEC's action was contrary to law. Now before the court is FEC's motion to dismiss under Rule 12(b)(1) for lack of jurisdiction and under Rule 12(b)(6) for failure to state a claim. Because the plaintiff has alleged that his injury is capable of repetition, yet evading review, the court has jurisdiction to adjudicate the merits. And because the court concludes that the FEC's decision was not supported by substantial evidence, the court will deny the FEC's motion and remand this matter back to the agency.

## II.  BACKGROUND

### A.  Legal Framework

The FECA prohibits corporations from making financial contributions in connection with any federal election.  2 U.S.C. § 441b(a).  Yet in recognition of the importance that debates play in informing the electorate, the FECA allows corporations to defray the costs of nonpartisan televised debates.  *Id.* § 431(9)(B)(ii) (allowing corporations to sponsor "nonpartisan activity designed to encourage individuals to vote or to register to vote"); *Hagelin v. FEC*, 411 F.3d 237, 238 (D.C. Cir. 2005); *see Hagelin v. FEC*, 1996 WL 566762, at *3 (D.D.C. Oct. 1, 1996) (concluding that "the debate medium through the TV . . . is not only important but probably vital and essential in today's world of electronic communication").  Accordingly, corporations may provide financial backing to organizations that stage debates, but only if certain conditions are met to ensure that the debates remain nonpartisan.  11 C.F.R. § 114.4(f).  In particular, FEC regulations require that the debate staging organization may not "endorse, support or oppose political candidates," *id.* § 110.13(a)(1), and the debate cannot be structured "to promote or advance one candidate over another," *id.* § 110.13(b)(2).  When determining which candidates may participate in the debate, the debate staging organization must employ "pre-established, objective criteria."  *Id.* § 110.13(c).

Any person who believes a violation of the FECA has occurred may file an administrative complaint with the FEC.  2 U.S.C. § 437g(a)(1).  After receiving the complaint, the FEC may investigate the matter and determine the appropriate course of action.  *See generally id.* § 437g(a)(2)–(6).  If the FEC determines that no violation has occurred, it may dismiss the complaint.  *See id.* § 437(g)(a)(8)(A); *Hagelin*, 411 F.3d at 239.  A party whose complaint has been dismissed may then file a civil action in this court to challenge the legality of the FEC's decision.  2 U.S.C. § 437g(a)(8)(A).

### B.  Factual Allegations and Procedural History

On September 1, 2010, a consortium of eight newspapers known as the Ohio News Organization ("ONO") announced that it was sponsoring a series of televised debates between the Democratic and Republican nominees in Ohio's U.S. Senate race.  Pl.'s Opp'n at 7.  The debates were scheduled to take place in October 2010, the month before the election.  *Id.*  La Botz claims that he was not included in any pre-debate negotiations with ONO, and he alleges that he never received any prior notice of the fact that the debates were to take place.  *Id.*  On September 21, 2010, La Botz filed an administrative complaint with the FEC, alleging that ONO violated federal regulations by failing to use "pre-established" and "objective" criteria when selecting the debate participants.  Administrative Record ("AR") 116–17.

The FEC investigated the complaint's allegations and solicited responses from ONO, as well as the Republican and Democratic campaigns' respective committees and treasurers.  AR 117.  The FEC's general counsel then issued a report which concluded that ONO's debate selection criteria did not violate FEC regulations.  *See generally* AR 116–20.  The report noted that ONO's criteria were consistent with a number of different factors the FEC had characterized as objective in prior cases, including the "percentage of votes by a candidate received in a previous election; the level of campaign activity by the candidate; his or her fundraising ability and/or standing in the polls; and eligibility for ballot access."  AR 119.  The report thus concluded that there was "no reason to believe" that ONO violated the FECA.  AR 120.  Soon thereafter, the commissioners of the FEC unanimously voted to dismiss the complaint.  AR 123.  La Botz subsequently brought suit in this court, alleging that the FEC's decision was contrary to law.  Now before the court is the FEC's motion to dismiss.

### III.  ANALYSIS

#### A.  The Court Has Jurisdiction to Decide La Botz's Claim

Article III of the Constitution limits the power of federal courts to actual "Cases" and "Controversies."  U.S. CONST. art. III, § 2.  From this requirement courts have derived several doctrines—including standing and mootness—to ensure that courts do not stray beyond the limits of their constitutionally allotted authority.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (noting that the several doctrines that elaborate upon Article III's case and controversy requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society.").

To meet the constitutional requirement of standing, a plaintiff must show that: (1) he has suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Courts assess standing by measuring the facts as they existed at the time the suit commenced.  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).  Thus, standing must be ascertained from the facts as they existed when La Botz first filed his administrative complaint with the FEC in September 2010, two months before the election.  *See Natural Law Party of the U.S. v. FEC*, 111 F. Supp. 2d 33, 50 (D.D.C. 2000).

La Botz alleges that he was injured when he was excluded from the debates.  Pl.'s Opp'n at 20.  If his exclusion violated the FECA, this injury suffices for the purposes of Article III.  *Buchanan v. FEC*, 112 F. Supp. 2d 58, 68 (2000) (concluding that the unfair exclusion from a presidential debate, in violation of FEC regulations, constituted an Article III injury); *Natural*

*Law Party*, 111 F. Supp. 2d at 49 (same).  Of course, there are limits to who may assert this type of injury.  For example, voters cannot assert standing based on their generalized interest in fair elections.  *Gottlieb v. FEC*, 143 F.3d 618, 622 (D.C. Cir. 1998); *see Becker v. FEC*, 230 F.3d 381, 389 (1st Cir. 2000) ("[T]he harm done to the general public by corruption of the political process is not a sufficiently concrete, personalized injury to establish standing.").  But La Botz was no mere bystander—he was a candidate for office.  And candidates who allege that they were forced to compete in an illegally structured campaign environment have stated a sufficient injury for the purposes of Article III.  *Shays v. FEC*, 414 F.3d 76, 85 (D.C. Cir. 2005); *Natural Law Party*, 111 F. Supp. 2d at 44 (concluding that the "inability to compete on an equal footing" in an election "due to the application of allegedly biased criteria" constitutes an injury for the purposes of Article III); *Buchanan*, 112 F. Supp. 2d at 65 ("When a debate sponsor uses subjective criteria for choosing the participants, the candidates are the ones who suffer a 'concrete and particularized' injury that would imminently deprive them of a fair opportunity to compete on equal footing with their rivals." (citing *Lujan*, 504 U.S. at 560)).

The second element of standing is easily satisfied here: causation may be established simply by alleging that the FEC failed to enforce the laws it was designed to implement.  *Buchanan*, 112 F. Supp. 2d at 68; *Natural Law Party*, 111 F. Supp. 2d at 49.

Finally, La Botz must satisfy the third element by demonstrating that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61.  In the electoral context, a plaintiff may satisfy the "redressability" prong by showing that the FEC could fairly reassess his complaint on remand.  Of course, the court need not determine that La Botz will ultimately succeed.  *Buchanan*, 112 F. Supp. 2d at 69 (concluding that "the fact that an agency might not ultimately find in the plaintiffs' favor on

5

remand does not destroy the plaintiff's [sic] standing to challenge the agency's decision"). It is enough that upon remand, the FEC could determine that ONO violated FEC regulations by using criteria that systematically disfavored third-party candidates. *Id.*

To be clear, La Botz does not need to show that any eventual success on remand would translate to success in the electoral arena. *LaRoque v. Holder*, 650 F.3d 777, 787 (D.C. Cir. 2011) ("[C]andidates may have standing to challenge illegally structured campaign environments even if the multiplicity of factors bearing on elections prevents them from establishing with any certainty that the challenged rules will disadvantage their campaigns."). Nor is La Botz required to demonstrate that he would have been invited to the debates if ONO had used a different set of criteria. *Buchanan*, 112 F. Supp. 2d at 68 ("[T]he mere fact that [the plaintiff] may ultimately be thwarted in his attempts to get into the debates is insufficient to deprive him of standing to challenge the [debate sponsor's] debate criteria.").[1] Instead, he can prevail by alleging that a decision on the merits and a subsequent victory on remand may curtail ONO's alleged bias and decrease the probability that he will be unfairly excluded from any future debates. *Natural Law Party*, 111 F. Supp. 2d at 50.

---

[1] The court has serious doubts as to whether La Botz would have qualified for the debate under any objective set of criteria. *See* AR 77–104 (indicating that pre-election polls registered La Botz with less than one percent support); Def.'s Mot. at 4 (indicating that La Botz received less than one percent of the total votes in the election). But these doubts do not deprive La Botz of standing. Given the unpredictable nature of an electoral campaign, it seems doubtful that any plaintiff could conclusively demonstrate that he or she would have been a contender but for the imposition of a procedurally unfair campaign environment. *Shays*, 414 F.3d at 86 (concluding that congressmen were not required to establish with any certainty that their reelection campaigns would be disadvantaged by the FEC's alleged deviation from the Bipartisan Campaign Reform Act). Here, La Botz alleges that ONO's biased criteria increased the probability that he would be unfairly excluded from this and future debates. And such an allegation may establish candidates' standing, "no matter what their level of popular support." *Natural Law Party*, 111 F. Supp. 2d at 50. In sum, the fact that La Botz could have been excluded from the debate for fair reasons does not foreclose his ability to argue that he was excluded for unfair reasons.

The FEC nonetheless maintains that a favorable ruling on the merits would be too little, too late.  Since La Botz filed suit, the debates were held, the ballots were cast, and a victor declared.  Because the court is powerless to alter these events, the FEC insists that La Botz's injury can no longer be redressed.  A fair point, but the FEC is incorrect to argue that these events rob La Botz of standing.  Rather, the FEC's redressability argument must be decided under the rubric of mootness.

Standing is assessed by measuring the facts as they existed at the time a suit commences.  *Del Monte*, 570 F.3d at 324.  But even if standing once existed, courts must take additional pains to ensure that jurisdiction continues to exist throughout all stages of the litigation.  *Davis v. FEC*, 554 U.S. 724, 732–33 (2008) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").  Thus, later events may render a once-viable claim moot.  *Becker v. FEC*, 230 F.3d at 387 n.3 ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); *see Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) (noting that "[s]tanding is assessed at the time the action commences," whereas mootness concerns whether "a judiciable controversy existed but no longer remains").  At least, this is the approach most often taken in similar cases.  *Davis v. FEC*, 554 U.S. at 736 (dispute was not mooted by passing of election cycle); *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (same), *Shays*, 424 F. Supp. 2d at 110 (same); *Natural Law Party*, 111 F. Supp. 2d at 40–41 (same).[2]

---

[2] The FEC's position may be understandable given the overlap between the doctrines of standing and mootness.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (noting that "confusion" between the two doctrines "is understandable").  In particular, both doctrines reflect a concern with redressability.  *Compare Lujan*, 504 U.S. at 561 (to establish

The doctrine of mootness is a logical corollary to Article III's case-or-controversy requirement: if subsequent events make it impossible for the court to grant any effectual relief to the prevailing party, "any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *see Powell v. McCormack*, 395 U.S. 486, 496 (1969) ("Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."). Yet an exception to this rule exists if a practice no longer affects the parties but is "capable of repetition, yet evading review." *FEC v. Wis. Right to Life*, 551 U.S. at 462; *see Davis*, 554 U.S. at 735 (noting that challenges to FEC decisions "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review"). La Botz argues that his case falls within this exception, and the court agrees.

To invoke this rule, a plaintiff must show that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a

---

standing, a plaintiff must show that it is likely that his injury will be "redressed by a favorable decision") *with Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("The mootness doctrine ensures that judicial relief can still redress the asserted injury."). Understandably so: if Article III's case-or-controversy requirement is to have any meaning, the court's opinion must consist of something more than helpful advice. It must be capable of remedying the plaintiff's injury. *See Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 876 (7th Cir. 1987) (Easterbrook, J.) (underscoring the importance of the "redressability rule—the principle that a case is justiciable only when a constitutional adjudication is capable of solving the plaintiff's problems"). Yet despite their similarities, the two doctrines remain distinct. *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1255 (D.C. Cir. 2004) ("True, standing and mootness are closely related, but they are cousins, not twins."). And here, precedent makes clear that events occurring after the plaintiff filed suit fall under the doctrine of mootness. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1267 (11th Cir. 2001) ("[A] party's standing to sue is generally measured at the time of the complaint, with the effect of subsequent events generally analyzed under mootness principles."); *Becker v. FEC*, 230 F.3d at 387 n.3 (same); *Shays*, 424 F. Supp. 2d at 110 (same). The FEC's insistence to the contrary is of no moment. *Shays*, 424 F. Supp. 2d at 110 ("Just because defendants have uttered the word 'redressibility' [sic] instead of 'mootness,' however, does not change the fact that defendants are raising, at heart, a mootness challenge.").

reasonable expectation that the same complaining party will be subject to the same action again." *FEC v. Wis. Right to Life*, 551 U.S. at 462. Regarding the first prong, the time frame presented by electoral disputes rarely allows for resolution through litigation. *Johnson v. FCC*, 829 F.2d 157, 159 n.7 (D.C. Cir. 1987); *Shays*, 42 F. Supp. 2d at 111. Electoral disputes are thus "paradigmatic" examples of cases that cannot be fully litigated before the particular controversy expires. *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009).

The FEC suggests that La Botz has not shown that "the *same complaining party* would be subjected to the *same action* again." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002). In the electoral context, many courts have concluded that a plaintiff need only show that *others similarly situated* might suffer a comparable harm in the future. *E.g.*, *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (holding that although the 1972 election had long since passed, the case was not moot because the statute under review would apply to other candidates in the future); *N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 435–36 (4th Cir. 2008) (rejecting the argument that an ex-candidate's claims were "capable of repetition, yet evading review" only if the ex-candidate alleged an intent to run again); *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000) (same); *Johnson v. FCC*, 829 F.2d at 159 n.7 (concluding there was jurisdiction even when the plaintiff had not shown he was likely to run for office again).

In any event, this court need not reconcile any putative discrepancy in the case law to resolve this case; La Botz has run for office in the past and he declares that "it is likely that [he] will run for federal office in Ohio again in the future." Pl.'s Opp'n, Ex. A (Decl. of Dan La Botz) ¶¶ 7–9. The defendants do not present any evidence to rebut the plaintiff's assertion or to diminish that likelihood. Here, La Botz bears the burden of proving that jurisdictional facts exist

9

by a preponderance of the evidence, and the court concludes that he has done so. *See Merle v. United States*, 351 F.3d 92, 95 (3d Cir. 2003) (concluding that even oblique statements implying future candidacy are sufficient to establish jurisdiction). In the simplest of terms, preponderance of the evidence means more likely than not—and La Botz's statement implies exactly that. Accordingly, La Botz's case is not moot and the court has jurisdiction to adjudicate the merits of his case.

### B. La Botz Has Stated a Claim on Which Relief Can Be Granted

#### 1. Legal Standard for the Court's Review of FEC Action[3]

A court may not disturb an FEC decision to dismiss a complaint unless the dismissal was "contrary to law." 2 U.S.C. § 437g(a)(8). This phrase has been construed to mirror the familiar standard that normally governs the judicial review of administrative decisions; namely, the FEC's dismissal may be overturned only if it was "arbitrary or capricious, or an abuse of discretion." *Hagelin*, 411 F.3d at 266; *see* 5 U.S.C. § 706(2)(A). This standard is "highly deferential" and presumes the validity of the agency's acts. *See Larouche's Comm. for a New Bretton Woods v. FEC*, 439 F.3d 733, 747 (D.C. Cir. 2006). However, courts must not abdicate the judicial duty to carefully "review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." *Natural Res. Def. Council v. EPA*, 902 F.2d 962, 968 (D.C. Cir. 1990) (internal quotation marks omitted). Thus, the agency must articulate a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assoc. of the*

---

[3] Ordinarily, a 12(b)(6) motion turns on the complaint's factual allegations and whether they state a plausible legal claim. When reviewing agency action, however, the district judge essentially sits as an appellate tribunal, and the entire case on review is a pure question of law. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

*U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Of course, the "agency's explanation need not be a model of analytic precision"; rather, "[a] reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (internal quotation and citation omitted). Finally, an agency decision must be supported by substantial evidence. *See Larouche's Comm. for a New Bretton Woods*, 439 F.3d at 747; *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) ("The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.").

### 2. The FEC's Dismissal of La Botz's Administrative Complaint Was Not Based on Substantial Evidence

The FEC argues that it dismissed La Botz's administrative complaint only after determining that ONO employed pre-established, objective criteria to select the candidates who would be invited to the debate. Def.'s Mot. at 18. La Botz counters that ONO did not present any written evidence of pre-established debate criteria, thereby suggesting that the only evidence in favor of ONO should be discounted as a *post hoc* rationalization. Pl.'s Opp'n at 27. La Botz also argues that ONO's debate criteria were not suitably objective because they were designed to confine the debate to the two major parties' candidates. *Id.*[4] He therefore argues that the FEC's decision was contrary to law.

The governing regulation states that:

For all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate. For general election debates, staging organizations(s) shall not use nomination by a particular political

---

[4]   The plaintiff also alleges that he was not notified of the pending debate or made aware of the selection criteria, but no FEC rules or regulations require that the debate sponsors publicly disclose the criteria or send notifications to potential candidates. The court therefore concludes that the FEC's rejection of these allegations was not arbitrary or capricious.

party as the sole objective criterion to determine whether to include a candidate in a debate.

11 C.F.R. § 110.13(c).  The regulation does not describe the phrase "pre-established objective criteria" with any precision.  *See Perot v. FEC*, 97 F.3d 553, 560 (D.C. Cir. 1996).  As a result, the authority to define "pre-established objective criteria" rests with the FEC.  *Id.*  The phrase, however, suggests two distinct components: 1) the criteria must be pre-established, and 2) they must be objective.

The FEC's general counsel typically provides a report that serves as explanation for its actions and the basis for judicial review.  *See FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 38–39 & n.19 (1981).  Here, the FEC's analysis of whether ONO's criteria were pre-established is decidedly succinct.  Its only mention of the matter consists of the following sentence: "it appears that [ONO's] debate selection criteria were pre-existing and objective . . . and consistent with a number of different criteria the Commission has previously found to have been acceptably 'objective.'"  AR 119.  The court is mindful that the agency is not required to provide an elaborate explanation of its reasoning.  *See Bush-Quayle '92 Primary Comm., Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997) ("We may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears."); *Common Cause v. FEC*, 906 F.2d 705, 706 (D.C. Cir. 1990) (noting that "a decision of less than ideal clarity must still be upheld so long as the agency's path may reasonably be discerned") (citations and quotation marks omitted).  But here, the FEC's one-sentence analysis threatens to "cross the line from the tolerably terse to the intolerably mute."  *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

More important than the brevity of the agency's reasoning, however, is the evidence upon which it is based. And here, an independent review of the record does not yield much evidence to bolster the FEC's conclusion. The FEC appears to have based its decision on an affidavit submitted by Benjamin Marrison, an editor of the Columbus Dispatch (and a member of the ONO consortium), which states:

> [ONO] pre-established a number of criteria for selecting the candidates to participate in the debates . . . . [ONO's] pre-selected criteria first ensured the eligibility of the candidates and then pared down the field of candidates to the two frontrunners based upon indicators of electoral support, including independent current (and historical) polling including Quinnipiac polling, conversation with political reporters and sources regarding the races in question, and financial disclosures which provide insights into a candidates [sic] viability.

AR 83–84. But this affidavit suffers from two serious flaws. First, it is unclear from the face of the affidavit why the declarant has first-hand knowledge of the assertions or is otherwise competent to testify to such. Ordinarily, a witness' testimony must meet a basic threshold: it must be based on personal knowledge. *See* FED. R. CIV. P. 56(c) (requiring that affidavits or declarations used to support a motion for summary judgment be made on personal knowledge); *see also* FED. R. EVID. 701(a). And while an agency may consider evidence that is not formally admissible in a judicial proceeding, to constitute "substantial evidence" the affidavit must at least contain indicia that it is "reliable and trustworthy." *See EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002); *see also Consol. Edison Co. v. NLRB*, 305 U.S. 197, 230 (1938) (noting that administrative agencies are free "from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order," but that agency decisions must have a "basis in evidence having rational probative force"). The court has little assurance that Marrison's affidavit can meet this relatively low bar. *See McKinley v. FDIC*, 756 F. Supp. 2d 105, 112–13 (D.D.C. 2010)

(concluding that agency action could not be sustained on the basis of a single declaration which was not based on personal knowledge).  The affidavit is written in summary fashion.  But Mr. Marrison is the editor of one of the eight newspapers that organized the debate.  It is unclear whether Mr. Marrison was directly involved in establishing the criteria or, if not, how he came to directly understand their genesis.

Second, this affidavit was only submitted after the FEC inquiry had commenced.  And such affidavits raise the risk that they will merely provide a vehicle for a party's *post hoc* rationalizations.  This sole affidavit highlights the absence of any contemporaneous evidence suggesting that ONO employed pre-established selection criteria.  *Cf. Ponte v. Real*, 471 U.S. 491, 509 (1985) ("The best evidence of why a decision was made as it was is usually an explanation, however brief, rendered *at the time of the decision*.").  In particular, ONO has not produced any contemporaneously written formulation of the criteria it purportedly utilized.[5]  And while FEC regulations do not specifically require debate staging organizations to reduce their criteria to writing, it is strongly encouraged:

> Although the new rules do not require staging organizations to do so, those staging debates would be well advised to reduce their objective criteria to writing and to make the criteria available to all candidates before the debate.  This will enable staging organizations to show how they decided which candidates to invite to the debate.  Staging organizations must be able to show that their objective criteria were used to pick the participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants.

Corporate and Labor Organization Activity; Express Advocacy and Coordination with Candidates, 60 Fed. Reg. 64260-01 (Dec. 14, 1995) (to be codified at C.F.R. pts. 100, 102, 109, 110 & 114), *available at* 1995 WL 735941.

---

[5] Given that eight newspapers were involved in organizing the debates and the inherent difficulty in coordinating this many entities, it would be highly unusual if no contemporaneous evidence existed in the form of meeting notes or e-mail exchanges.

Moreover, a contemporaneous document in the record contradicts the FEC's conclusion. On September 8, 2010, a member of the ONO consortium wrote: "The Ohio News Organization generally follows the structure used by the Commission on Presidential Debates, which allows for only the *major-party candidates* to debate." AR 37 (emphasis added). As set forth above, FEC regulations forbid major party nomination to be the sole criterion employed to select debate participants. From the Report's analysis, it is unclear whether this email (which suggests that major-party nomination was the sole criterion) was considered and discounted, or whether it was ignored altogether. *See Antosh v. FEC*, 599 F. Supp. 850, 853 (D.D.C. 1984) (concluding that the FEC's decision was arbitrary or capricious because it "ignored persuasive evidence in the record"). And conclusions made without explanation or reference to the record suggest that an agency has not "genuinely engaged in reasoned decision making." *Greater Boston Television*, 444 F.2d at 851.

In sum, the court cannot conclude that the FEC's decision was backed by substantial evidence. Here, the FEC's burden is admittedly slight; it need only show that it relied on "such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009). Yet the FEC has not done so. Although the FEC's decision is grounded in a single post-litigation affidavit, this alone is not a sufficient reason for remand. *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 636 (D.C. Cir. 2010) ("The substantial evidence inquiry turns not on how many discrete pieces of evidence the [agency] relies on, but on whether that evidence adequately supports its ultimate decision."). However, because the affidavit is not clearly supported by personal knowledge and is, in fact, contradicted by contemporaneous written evidence, the court concludes that the FEC's conclusion is not supported by "substantial evidence." And while the court is mindful of the

deference that ordinarily insulates the FEC from judicial second-guessing, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272 (1968); *see AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review."); *Antosh*, 599 F. Supp. at 853 (noting that courts need not "accept meekly administrative pronouncements clearly at variance with established facts").[6] In sum, the court cannot conclude that the FEC's determination that ONO employed pre-existing criteria was supported by substantial evidence. Its conclusion is therefore "contrary to law." 2 U.S.C. § 437g(a)(8).

The court wishes to make clear that its holding only applies to the FEC's determination that ONO used pre-existing criteria to select its debate participants. The FEC also listed a number of criteria that could be considered "objective" under FEC regulations. AR 119

---

[6]  None of this is to say that the FEC is required to reach a different conclusion on remand. In particular, it seems possible that the FEC's decision to dismiss La Botz's administrative complaint could have been justified entirely by the FEC's prosecutorial discretion, which is "considerable." *Nader v. FEC*, 823 F. Supp. 2d 53, 65 (D.D.C. 2011); *Akins v. FEC*, 736 F. Supp. 2d 9, 21 (D.D.C. 2010) ("The FEC has broad discretionary power in determining whether to investigate a claim, and whether to pursue civil enforcement under the [FECA]."); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (noting that the decision to not investigate a claim involves a complicated balancing of various factors that are "peculiarly within [the agency's] expertise," including whether a violation has occurred, whether the agency's resources are better used elsewhere, whether its action would result in success, and whether there are sufficient resources available to take any action at all). And, as set forth previously, it is unlikely that La Botz would have benefited from the application of any objective criteria; therefore, a denial of La Botz's complaint based on prosecutorial discretion might be a wise use of the FEC's limited resources. But while this might have served as a basis for the FEC's original decision, the court cannot now conjure any retroactive justification. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) ("The [agency] may have an adequate explanation for the result it reached in this case. We cannot, however, assume that such an explanation exists until we see it.").

(concluding that objective criteria included the "percentage of votes by a candidate received in a previous election; the level of campaign activity by the candidate; his or her fundraising ability and/or standing in the polls; and eligibility for ballot access"). The court has no quarrel with FEC's reasoning on this score. Precedent makes clear that polling data may provide an objective measure of a candidate's viability. *See Buchanan*, 112 F. Supp. 2d at 74 (noting that the language in federal regulations "manifests a clear intent on their part not to preclude debate sponsors from using polls" and concluding that the use of a 15% polling threshold requirement was an objective criterion). The same goes for fundraising reports, which measure a candidate's level of financial support. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998) (characterizing a presidential candidate's failure to file fundraising reports and lack of financial support as an "objective" indicator of his low level of support). In addition, party support is an acceptable consideration, provided that party affiliation is not the *only* consideration. *See* Corporate and Labor Organization Activity; Express Advocacy and Coordination With Candidates, 60 Fed. Reg. 64260-01 (Dec. 14, 1995) (to be codified at C.F.R. pts. 100, 102, 109, 110 & 114) ("[N]omination by a particular political party, such as a major party, may not be the sole criterion used to bar a candidate from participating in a general election debate. But, in situations where, for example, candidates must satisfy three of five objective criteria, nomination by a major party may be one of the criteria."). Thus, the court has every reason to believe that these criteria are "objective" under FEC regulations. But the current record does not provide reasoned support for the position that ONO actually used these objective benchmarks to choose its debate participants. Accordingly, the court will remand this matter back to the FEC.

## IV.  CONCLUSION

For the foregoing reasons, the court will deny the FEC's motion to dismiss and will remand this matter back to the agency for proceedings consistent with the court's opinion.  An order consistent with this memorandum opinion is separately issued this 5th day of September, 2012.

                                                                    RUDOLPH CONTRERAS
                                                                    United States District Judge